UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT MCBRIDE,

                          Plaintiff,

              v.

C&C APARTMENT MANAGEMENT LLC
BRENTON GEORGE, IVO KELLO,
SEPTIMUS BAILEY, LUIS TORRES, and
WILSON ESQUILIN,

                          Defendants.

21 Civ. 02989 (DEH)

**<u>AMENDED OPINION
AND ORDER</u>**

DALE E. HO, United States District Judge:

Plaintiff Robert McBride ("Plaintiff" or "McBride"), appearing *pro se*, brings this employment discrimination case against: his former employer, C&C Apartment Management LLC ("C&C"); his former coworkers Brenton George, Ivo Kello, Septimus Bailey, Luis Torres; and a resident of a building at which he was formerly employed, Wilson Esquilin. McBride alleges that the Defendants discriminated against him on the basis of his race, religion, and national origin, and he brings his claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290; and the New York City Human Rights Law ("NYCHRL"). Plaintiff also raises New York State common law claims of slander and defamation.

Defendants have filed two separate motions for summary judgment.[1] For the reasons that follow, both motions for summary judgment are **GRANTED.**

---

[1] Defendants C&C and Ivo Kello jointly filed a motion for summary judgment on January 22, 2024. *See* ECF No. 135. Separately, on the same day, Defendants Septimus Bailey and Brenton George jointly filed a motion for summary judgment. *See* ECF No. 142.

## BACKGROUND

Where a plaintiff proceeds *pro se*, courts may consider facts raised in his Opposition,[2] Complaint, and Amended Complaint.[3]  Because a "complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference," the Court considers attachments to Plaintiff's pleadings.[4]  Thus, for purposes of adjudicating Defendants' motions for summary judgment, the following facts are drawn primarily from the Complaint, Amended Complaints and as supplemented by the Opposition, and assumed to be true—with all reasonable inferences drawn in the Plaintiff's favor.

### A.  Factual Background

Broadly speaking, the facts underlying McBride's claims can be divided into two overlapping categories: (1) actions constituting C&C's alleged employment discrimination and/or relation; and (2) actions taken by C&C staff and residents that are alleged to have created a hostile work environment.

---

[2] *See* Nielsen v. Rabin, 746 F.3d 58, 63 (2d Cir. 2014) (considering additional facts alleged in a *pro se* plaintiff's opposition brief as supplementing the pleadings); Kiss v. Torres, No. 21 Civ. 10391, 2024 WL 1210941, at *2 (S.D.N.Y. Mar. 19, 2024) ("Because Plaintiff is proceeding pro se, the Court will [] consider the factual assertions raised for the first time in his Opposition briefs to the extent they are consistent with the Amended Complaint.").

[3] *See* Taylor v. Quayyum, No. 15 Civ. 1143, 2021 WL 6065743, at *2 (S.D.N.Y. Dec. 21, 2021) ("Because Plaintiff is proceeding *pro se*, the Court will consider the Complaint, [and Amended Complaint] . . . together as the operative pleading."); Lewis v. Weiss, No. 12 Civ. 7242, 2016 WL 1718251, at *3 (S.D.N.Y. Apr. 27, 2016) ("[W]hile Plaintiff was instructed that any amended complaint would supplant, rather than supplement, her prior complaint, the Court will consider the allegations and attachments to her amended complaint as well as those her second amended complaint.").

[4] *See* Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

### 1. Employment discrimination and retaliation

C&C, a property management company, oversees the maintenance of three buildings at the Greenpoint Landing Project ("Greenpoint Complex") in Brooklyn, New York: 7 Bell Slip ("Bell Slip"), 33 Eagle Street ("Eagle Street"), and 5 Blue Slip ("Blue Slip").

**Bell Slip.**  Initially, McBride was stationed at Bell Slip, where he was supervised by building superintendent Luis Torres ("Torres").[5]  The parties disagree about McBride's job performance during his time at Bell Slip.  McBride alleges that he performed his duties satisfactorily;[6] Defendants state that McBride failed to follow directions, was insubordinate, misrepresented his job title in conversations with tenants, and otherwise behaved inappropriately with tenants.[7]  The parties agree, however, that McBride and Torres's relationship became increasingly acrimonious.  Tensions came to a head in July 2017, when McBride alleges that Torres threatened to suspend him for unsatisfactorily performing his job responsibilities.[8]  When McBride confronted Torres about this possible suspension, the men began arguing.  McBride alleges that, during the argument, Torres said "suck my dick, [N-word]" to him.[9]  McBride reported the incident to Ivo Kello ("Kello"), a C&C property manager.[10]  Kello investigated,

---

[5] *Id.*

[6] *Id.* at 6.

[7] C&C Defendants' Rule 56.1 Statement ¶ 11.

[8] Second Am. Compl. ("SAC") 8, ECF No. 40 ("Luis Torres . . . sent another Porter named Demar with a message saying if I don't put the garbage out and do my job that I will get suspended.").

[9] *Id.* ("I approached Luis Torres (Superintendent) and asked what is Problem. He knows I always do my work with no Problem. Luis Torres (Superintendent) Replied 'Suck my Dick [N-word]' In front of 5 staff members."); C&C Defendants' Rule 56.1 Statement ("C&C Defs.' Rule 56.1 Statement") ¶ 12, ECF No. 139 ("In 2017, McBride reported to Kello that there was an altercation between him and Torres, and Torres repeatedly told McBride to 'go suck my dick, -N-.'").

[10] SAC 8 ("I immediately contact Ivo Kello of Luis Torres behavior.").

concluding that both McBride and Torres behaved inappropriately.[11]  He subsequently issued

both men written disciplinary warnings,[12] but McBride refused to sign his.[13]  Because McBride

and Torres's working relationship became untenable, McBride was transferred from Bell Slip to

Eagle Street.[14]

**Eagle Street.**  At Eagle Street, McBride again clashed with his supervisors.  This time,

the conflict concerned his working hours.  From when he was hired in 2016 until March 2019,

McBride worked from 8:00 AM until 4:00 PM.[15]  These were not McBride's official working

hours but instead a schedule reflecting his practice of working through his lunch break and

leaving an hour early at the end of his shift.[16]  When C&C instituted a "change in shift" and

insisted that McBride work from 8:00 AM until 5:00 PM, McBride resisted.[17]  McBride alleges

---

[11] C&C Defendants' Rule 56.1 Statement ¶ 13.

[12] *Id.*

[13] *Id.*  McBride states that he did not sign the report because it was inaccurate.  *See* SAC 8-9 ("I Read the Report and Nothing in the Report was True Nor did it correspond to what actually happened . . . . I Refuse to sign with Explanation that the Report is fabricated and not true."). McBride now alleges that C&C fabricated this disciplinary report.  *See* Plaintiff's Response to Defendant's Rule 56.1 Statements of Facts ("Resp. to Def.'s Rule 56.1 Statement") 9, ECF No. 153 ("The 3 or 4 misbehavior reports are fabricated. Never signed by Plaintiff or is it.").

[14] C&C Defs.' Rule 56.1 Statement ¶ 17.

[15] C&C Defs.' Rule 56.1 Statement ¶¶ 4, 19, 24.

[16] Affidavit of Juliette Marshall in Support of Defendants' Motion for Summary Judgment ¶ 19, ECF No. 137; *see also* Disciplinary Action Report Ex. G, ECF No. 137-7 ("Yesterday, your new manager informed you that the prior practice of working through lunch and then leaving early for the day would be discontinued, effective immediately. Your official shift is 8:00a.m. to 5:00p.m.").

[17] C&C Defendants' Rule 56.1 Statement ¶ 24 ("In March 2019, C&C issued a disciplinary action notice to McBride for insubordination for refusing to comply with a change in shift from 8:00 am to 4 pm to 8:00 am to 5 pm."); *see also* SAC 9 ("On 2/14/2019 I am confronted by Ivo Kello with Payroll and he wants me to stay a hour more from what he initially told me in the beginning of employment.).

that C&C subsequently docked his pay.[18]  He also alleges that C&C changed his work schedule—"adding" an extra hour to his shift—in retaliation for his making a complaint to human resources about workplace discrimination.[19]  C&C again issued McBride a written warning for his failure to work his full shift as officially scheduled.[20]  Sometime later, due to a conflict with a coworker regarding that coworker's alleged social media posts,[21] McBride was transferred from Eagle Street to Blue Slip.[22]

**Blue Slip.**  At Blue Slip, McBride's interpersonal conflicts continued.  McBride and another porter, Septimus Bailey ("Bailey"), had a difficult time working together.  Two conflicts between the men prompted C&C to intervene.  First, in October 2019, McBride and Bailey got into an argument over Bailey's playing of a radio in a room where both men worked.[23]  The argument escalated, and Bailey stated that McBride brandished a knife at him.[24]  McBride admitted to pulling the knife out during the fight, though he claimed to have simply placed it on the table between himself and Bailey rather than to have intentionally threatened his coworker.[25]

---

[18] SAC 10 ("So Ivo Kello demonstrate his ball buster techni[que] by taking 10 hrs from my check/pay.").

[19] *Id.* ("He also Enforce me to stay another hour After I mention/complain to Human Resources of Defamation and Discrimination at Work Place.").

[20] C&C Defs.' Rule 56.1 Statement ¶ 24 (In March 2019, C&C issued a disciplinary action notice to McBride for insubordination for refusing to comply with a change in shift from 8:00 am to 4 pm to 8:00 am to 5 pm.").

[21] *See infra* § A.2.

[22] C&C Defs.' Rule 56.1 Statement ¶ 29 ("The relationship between George and McBride had deteriorated, and C&C decided to transfer McBride to 5 Bell Slip where he would work with Bailey.").

[23] C&C Defs.' Rule 56.1 Statement ¶ 31.

[24] *Id.*

[25] *Id.* ¶ 32.

C&C ultimately issued both men written disciplinary warnings.[26]  Second, in January 2020, McBride and Bailey had an argument over sharing space in a building hallway.  Bailey was on a ladder painting, and McBride needed to pass.[27]  In the process of maneuvering past, Bailey claims that McBride bumped the ladder, causing Bailey to lose his balance.[28]  The incident prompted Bailey to complain to Kello that McBride was provoking and bullying him.[29] McBride, on the other hand, claimed that Bailey deliberately got in his way and did not let him pass.[30]  The incident resulted in C&C providing McBride and Bailey with resources for the company's employee assistance program.[31]

### 2.  Hostile Work Environment

McBride alleges that C&C employees and tenants' behaviors created hostile work environments at all three of the Greenpoint Landing buildings within which he worked.  The alleged hostility began at Bell Slip where, as noted above, McBride's supervisor, Torres, allegedly referred to McBride with a racial slur during an altercation and where McBride states that tenants began calling him a "sissy hole."[32]

After McBride was transferred to Eagle Street, Brenton George ("George"), an assistant superintendent, became McBride's supervisor.[33]  McBride alleges that George began an online campaign against him, uploading videos onto YouTube and creating posts on social media

---

[26] *Id.* ¶ 33.  McBride also claims that this disciplinary notice is fabricated.

[27] C&C Defs.' Rule 56.1 Statement ¶ 34.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] C&C Defs.' Rule 56.1 Statement ¶ 14.

[33] *Id.* ¶ 17.

websites calling him a "fake Muslim, fake Trinidadian[] who don't like himself, Pussyhole, and other derogatory names and statements to assassinate [his] character as a human being."[34] McBride also alleges that George shared links to these disparaging social media posts with residents[35] and with utility workers servicing the Greenpoint Complex's buildings.[36]  McBride admitted, however, that he did not hear George mention him by name in conversations with the technicians, nor did he witness George post anything on social media or independently view any post or video on George's social media accounts.[37]  He testified that he knew the posts were real because he saw his face on a video being watched by two strangers seated near him on the subway.[38]  McBride describes the videos as having gone "viral."[39]

McBride alleges George enlisted other C&C employees, and at least one tenant, to produce and distribute the social media posts.  He alleges that Torres, his former supervisor, told

---

[34] SAC 10.

[35] *Id.* ("On 2/18/2019 Brenton George is congregating with another tenant speaking about I have no Respect and also sharing the social media link with a tenant in the lobby.").

[36] *Id.* at 9 ("I could also hear Brenton George Exchanging/Sharing a social media link to National Grid technicians."); *id.* at 11 ("Brenton George is in a conversation with the sprinkler technician sharing the code/link to social media. Brenton George says it is on You Tube. Any chance he gets he provides.").

[37] *See* C&C Defs.' Rule 56.1 Statement ¶ 82; Defs.' Brenton George's and Septimus Bailey's Rule 56.1 Statement ¶ 27(d), ECF No. 142-3 ("Plaintiff admitted he . . . never saw George post anything on social media . . . and did not actually view any of the subsequent posts that he claims George uploaded.").

[38] Defs.' Brenton George's and Septimus Bailey's Rule 56.1 Statement ¶ 27(b) ("Plaintiff testified that the first and only time he viewed the video was when he was on the subway and happened to see two complete strangers across from him on the subway train watching a video on their phone, which apparently showed Plaintiff's face in a red background.").

[39] SAC 10 ("[Brenton George] assists in creating a hostile environment at work place and public. The tenants and public also share the social media link to make it viral.").

tenants about the social media posts.[40]  McBride further alleges that Bailey, the porter with

whom he did not get along, extracted photos and videos of McBride from the data room at Blue

Slip then gave the media to George, who incorporated the images and videos into social media

posts.[41]  McBride, however, admitted that he never witnessed Bailey extract photos or videos of

him from the building's data room.[42]  Wilson Esquilin ("Esquilin"), a Greenpoint Complex

tenant with whom McBride purportedly had a long-standing feud dating back to their teenage

years,[43] allegedly received photos and videos from Bailey, too, and incorporated the media into

posts about McBride that, among other things, called him a "cissy hole" and "instruct[ed] tenants

to disrespect [him] at work especially the Spanish."[44]

   McBride reported the alleged online harassment to C&C.[45]  The company was never able

to properly investigate his claims because McBride refused to provide his employer with links or

other means of accessing the online content.[46]  When Kello asked George if McBride's

---

[40] *Id.* ("On 2/15/2019 Luis Torres is speaking with technician . . . about the social media Calling me punta [sic] and I have no respect.").  The Court notes that "puta" is a derogatory word used in the Spanish language to refer to another as a sex worker.  *See* https://perma.cc/H35N-YXHA.

[41] SAC 17 ("Brenton George and Septimus Bailey was taking clips of videos from the Data Room to Post it on the social media.").

[42] Defs.' Brenton George's and Septimus Bailey's Rule 56.1 Statement ¶ 27(d) ("Plaintiff admitted that he never actually saw George or Bailey extracting photos/videos from the data room for posting on social media.").

[43] *See* SAC 13-14.

[44] *See id.* at 13 ("Wilson Esquilin is posting me on social media with Defamation that I can't fight, No Respect, Cissy hole, scared, instructs tenants to harass me at work Especially the Spanish and other derogatory Statements. He Retrieves Photos from Brenton George and staff members involve of Social Media Post.").

[45] *Id.* at 12.

[46] C&C Defs.' Rule 56.1 Statement ¶ 20 ("Kello asked McBride to provide the link to the video or the social media platform to which the video had been uploaded or some other information to allow him to view the video.  McBride refused and failed to provide the link or any other information about the video."); *id.* ¶ 71 ("In January 2020, Michael Prush of C&C asked McBride to provide the links to the social media videos he claimed were posted about him and

allegations were true, George denied making or distributing online content about McBride.[47]

McBride's only evidence regarding his allegation that George was responsible for the alleged

social media content is his own testimony that: (1) he had a positive relationship with tenants

living at the building within which he first worked, Bell Slip, but that the tenants at Eagle Street

(where George was his supervisor) did not like or respect him; and (2) his assertion that George's

speech pattern was similar to the words used in the social media posts.[48]

McBride alleges he was antagonized by coworkers and residents alike. With respect to

the former, McBride alleges in his Complaints that he heard George tell tenants that McBride

"gets no respect;"[49] called him a "cissy hole/c hole" in a conversation with a tenant;[50] and called

him a "Pussy hole" in conversations with other C&C employees.[51] McBride also testified that

---

McBride did not provide the link to the videos. McBride did not share the link to the social
media posts with Prush because he believed him to be untrustworthy.").

[47] *Id.* ¶ 21.

[48] Defs.' Brenton George's and Septimus Bailey's Rule 56.1 Statement ¶ 27(i) ("[W]hen Plaintiff
was asked at his deposition how he knew George engaged in this alleged conduct, Plaintiff
merely stated that when he started his employment (at 7 Bell Slip) he had respect from the
tenants and they were nice to him, but then tenants' behavior towards him changed after he was
transferred (to 33 Eagle Street)."); C&C Defendants' Rule 56.1 Statement ¶ 84 ("McBride claims
that he knows George was continuously reposting old videos and posting new videos about him
on social media through the similarity of George's comments and the words used on the social
media posts.").

[49] SAC 9 ("On 2/12/1019, Brenton George is in the lobby speaking with tenant 2M about
Respect and how I don't get any. The[y] both laughed."); *id.* at 15 ("On 10/20/2019 Brenton George
is in a conversation with tenant 5M and other Spanish tenants in the lobby that he gets no
Respect.").

[50] *Id.* at 10 ("On 2/18/2019 Brenton George is congregating with another tenant speaking about I
have no Respect and also sharing the social media link with a tenant in the lobby. Brenton
George utter cissy hole/c hole.").

[51] *Id.* at 12 ("On 5/30/2019, Ivo Kello (Property Manager)[,] Justine (Regional Manager)[,] Jose
Cruz (District Director)[,] Luis Torres (Superintendent)[, and] Brenton George arrived at 33
Eagle Street to conduct a meeting. They held a meeting with Brenton George to ask what is
going on. Brenton George utters that I am trying to be somebody that I am not and that I am
Pussy hole. They all laughed and he continue to explain why he did it. (post me on social

George called him a "fake Trinidadian" to his face.[52]  And he alleges that he heard Torres tell an outside maintenance technician that McBride is a "puta" who "ha[s] no Respect."[53]  Finally, McBride alleges that he overheard a different C&C employee, who is not a party to this lawsuit, refer to him as a "Pussy."[54]

McBride further alleges that at Eagle Street, tenants and strangers began making disparaging comments about him, which increased in frequency and severity until he was terminated.  Tensions began with tenants allegedly "uttering no Respect Pussy hole when they would pass [him] in the lobby."[55]  Then, McBride allegedly heard "two Spanish tenants speaking in the laundry Room saying [he] should Quit. He lose Respect. He is A Pussy. No Respect he's cleaning."[56]  Six months later, McBride alleges he was threatened by a tenant he witnessed kicking over wet floor signs, who told McBride that he was going to kill him and attempted to goad him into a fight.  McBride alleges that he "observed and heard Brenton George tell Septimus Bailey that he baited [McBride] with the tenant."[57]

Tenants "constantly verbally harass[ed] [McBride] daily by urinating in recycle bins, graffiti on stairway steps on 3rd and 4th floors, throwing garbage on lobby floors after cleaning them, dog feces on stairways and other evil schemes to get [him] to quit [his] employment," he

---

media).");  *id.* at 15 ("On 10/22/2019 I hear Brenton George, Septimus Bailey, Luis Torres and Karol discussing that I am a Pussyhole at 33 Eagle Street. They walked pass the compactor room where I was preparing working utensils to do the floors.").

[52] C&C Defs.' Rule 56.1 Statement ¶ 27 ("McBride claims that George called him 'fake Trinidadian' to his face but could not recall how many times.").

[53] SAC 10.

[54] *Id.* at 11.

[55] *Id.* at 9.

[56] *Id.* at 15.

[57] *Id.* at 16.

alleges.[58]  Moreover, he states that tenants called him a "fake Trinidadian," "sissy hole," "puta madre," and other disparaging names.  McBride also alleges that strangers on the subway would make similar disparaging comments to and about him, particularly "Spanish People."[59]

McBride alleges that George is responsible, at least in part, for the tenants' hostility; he alleges that George, whom he describes as having "a Great Communication with the tenants," "influence[d] and encourage[d] them to do the wrong thing," namely insult him.[60]  However, McBride never witnessed George instructing tenants to harass him or otherwise treat him negatively.[61]  McBride testified that his relationship with tenants deteriorated to the point of tenants yelling at and threatening him.  In the month before his termination, McBride had a conflict with a tenant; he alleges he was told by a tenant "No Respect[;] No one likes ya here" and was nearly spit on by a tenant, and the conflict escalated as a tenant swung a metal rod at a door.[62]  The police were called during this incident, precipitating McBride's termination; an investigation by C&C determined, based in part on surveillance video, that McBride did not attempt to deescalate the situation, but rather attempted to "engage" in a "fist fight."[63]

---

[58] SAC 17.

[59] *Id.* at 9 ("I began to hear tenants uttering no Respect Pussy hole when they would pass me in the lobby . . . . Heading home on the subway I would hear the same thing Especially from Spanish People.").

[60] *Id.* at 10.

[61] Defs.' Brenton George's and Septimus Bailey's Rule 56.1 Statement ¶ 27(g) (Plaintiff also admitted that while he saw George congregating with Bailey and tenants on certain occasions (and heard George 'talking about no respect and sissy hole and all this other stuff[']), he never actually witnessed George instructing them to harass Plaintiff or treat him negatively.").

[62] SAC 18-29.

[63] C&C Defs.' Rule 56.1 Statement ¶¶ 69-70, 72 ("C&C investigated this incident and determined that McBride did not attempt to deescalate the incident.  The surveillance video tape showed McBride raising his fists and taking a boxing stance to engage the tenant's visitor in a fist fight. . . . McBride was sent home after the incident with the tenant who was moving out; after which he had a meeting with C&C and was discharged.").

## LEGAL STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[64]  "A material fact is one that would affect the outcome of the suit under the governing law, and a dispute about a genuine issue of material fact occurs if the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party."[65]  Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."[66]

In evaluating a motion for summary judgment, a court must "construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."[67]  When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing particular materials in the record.[68]  Where, as here, the plaintiff is the party opposing summary judgment, the Court is "required to accept all sworn statements by [the plaintiff] as to matters on which []he [is] competent to testify, including what []he did, what []he observed, and what []he was told by company managers."[69]  To overcome a motion for summary judgment, however, the plaintiff may not rely on "conclusory statements, conjecture, and inadmissible evidence,"[70] but instead must offer some "hard evidence showing that [his] version of the events is not wholly

---

[64] Fed. R. Civ. P. 56(a); *see also* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[65] Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).

[66] Scott v. Harris, 550 U.S. 372, 380 (2007).

[67] Torcivia v. Suffolk Cnty., 17 F.4th 342, 354 (2d Cir. 2021).

[68] *See* Fed. R. Civ. P. 56(c)(1)(A).

[69] Davis-Garett v. Urban Outfitters, Inc., 921 F.3d 30, 46 (2d Cir. 2019).

[70] Ridinger v. Dow Jones & Co., 651 F.3d 309, 317 (2d Cir. 2011).

fanciful."[71]  The Court is required to "disregard all evidence favorable to the [defendants] that the jury is not required to believe.  That is, the court should give credence to the evidence favoring the [plaintiff] as well as that evidence supporting the [defendants] that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."[72]

Courts must take an extra measure of caution in evaluating employment discrimination claims because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions."[73]  However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation."[74]  It is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."[75]  Even in this context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment,"[76] and it is well established that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient' to defeat a summary judgment motion."[77]  Likewise, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary

---

[71] D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), *cert. denied*, 524 U.S. 911 (1998).

[72] *Davis-Garett*, 921 F.3d at 46 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000)).

[73] Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006).

[74] Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).

[75] *Abdu-Brisson*, 239 F.3d at 466.

[76] Conahan v. MedQuest Ltd., No. 20 Civ.1325, 2022 WL 16748585, at *3 (S.D.N.Y. Nov. 7, 2022).

[77] Fabrikant v. French, 691 F.3d 193, 205 (2d Cir. 2012) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986)).

judgment."[78]  A plaintiff's self-serving statement, without direct or circumstantial evidence to support the charge of discrimination, is also insufficient to defeat a motion for summary judgment.[79]

## DISCUSSION

### A. Federal Claims

Plaintiff brings race-, national origin-, and religion-based employment claims under Title VII and § 1981.  For the reasons discussed herein, Defendants' motions for summary judgment are granted, and McBride's claims are dismissed.

### 1. Employment Discrimination

#### a. Legal Standards

Title VII "prohibits employment discrimination on the basis of race, color, religion, sex, or national origin."[80]  Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment,"[81] which the Second Circuit has interpreted as, among other things, prohibiting employment discrimination on the basis of race.[82]  Allegations of discrimination under either statute are evaluated under the same test.[83]  When a plaintiff brings a discrimination claim under Title VII,

---

[78] Griffin v. Ambika Corp., 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000).

[79] *See* Fincher v. Depository Tr. & Clearing Corp., No. 6 Civ. 9959, 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008), *aff'd*, 604 F.3d 712 (2d Cir. 2010).

[80] Ricci v. DeStefano, 557 U.S. 557, 577 (2009).

[81] Patterson v. County of Oneida, 375 F.3d 206, 224 (2d Cir. 2004).

[82] *See, e.g.*, Alvarado v. United Hospice, Inc., 631 F. Supp. 3d 89, 111 (S.D.N.Y. 2022) ("The Second Circuit has construed this provision to prohibit employment discrimination on the basis of race.").

[83] *See* Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000); Cadet v. All. Nursing Staffing of N.Y., Inc., 632 F. Supp. 3d 202, 222 (S.D.N.Y. 2022) ("Hostile work environment, disparate treatment, and retaliation claims are analyzed in the same manner and under the same tests under both Title VII and Section 1981.").

Section 1981, or both but does not present "direct evidence of discrimination," his complaint must instead "be plausibly supported by facts alleged in the complaint [] that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent."[84]  If it is, the burden shifts to the defendant to justify its action with non-discriminatory reasoning.[85]  "If defendant does so, the burden returns to the plaintiff to show that the real reason for plaintiff's termination was" based on a protected characteristic covered by either Title VII or Section 1981.[86]

When Defendants' motions for summary judgment were initially filed, courts in this Circuit held that to allege an adverse employment action, a plaintiff was required to have endured some "*materially significant disadvantage* with respect to the terms of the plaintiff's employment."[87]  But the landscape has changed since the Supreme Court's decision in *Muldrow v. City of St. Louis*.[88]  Though the plaintiff in *Muldrow* brought her claim under Title VII, the case is applicable to Section 1981 claims too because, again, discrimination claims under both statutes are evaluated under the same test.  In *Muldrow*, the Supreme Court resolved a Circuit

---

[84] Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015).

[85] *See id.* at 312 ("[Plaintiff's] disparate treatment claim under Title VII [and] § 1981 . . . is subject to the burden-shifting evidentiary framework set forth in *McDonnell Douglas*."); Ruiz v. County of Rockland, 609 F.3d 486, 492 (2d Cir. 2010) ("Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for the termination.").

[86] *See Ruiz*, 609 F.3d at 492; *see also* Risco v. McHugh, 868 F. Supp. 2d 75, 98 (S.D.N.Y. 2012) ("[W]hen an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer." (citation omitted)).

[87] *Littlejohn*, 795 F.3d at 312 n.10 (emphasis in original).

[88] 144 S. Ct. 967 (2024).

split and rejected decisions of various Courts of Appeals—including the Second Circuit's—that required plaintiffs to allege "materially significant" employment actions.[89]  Instead, plaintiffs need only allege "*some* harm respecting an identifiable term or condition of employment," but that harm need not be "significant . . . [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar."[90]

While *Muldrow* clarified the "materially significant" element of proving an employment discrimination claim, it did not change the requirement that there be some evidence of discriminatory intent, which can come in many forms.  A plaintiff may, for example, rely on facts showing "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group, or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."[91]

---

[89] *See Muldrow*, 144 S. Ct. at 973 n.1, 974.

[90] *Id.* at 974 (emphasis added); *see also* Anderson v. Amazon.com, Inc., No. 23 Civ. 8347, 2024 WL 2801986, at *10 (S.D.N.Y. May 31, 2024) (applying *Muldrow* to a Section 1981 claim and explaining that the employment action alleged in either context "need not be materially adverse" (emphasis omitted)).

[91] *Littlejohn*, 795 F.3d at 312.

### b. Application

Here, McBride alleges four employment actions that could potentially give rise to an employment discrimination claim: transfer between buildings; discipline; termination; and retaliation (which is analyzed under a distinct legal standard), in the form of altered work hours and a deduction of pay, and termination. The Court analyzes each in turn.[92]

**Transfer**. "An internal transfer can constitute an adverse employment action if it is 'accompanied by a negative change in the terms and conditions of employment.'"[93] Per *Muldrow*, "[t]o make out a . . . discrimination claim, a transferee must show some harm respecting an identifiable term or condition of employment."[94] McBride has neither alleged nor shown any such harm resulting from either of his transfers. Even if he had, he would have also needed to show that his transfer was due to C&C's discriminatory intent. He does not do this, either. It is undisputed that C&C transferred McBride from Bell Slip to Eagle Street because his working relationship with Torres, his supervisor at Bell Slip, had deteriorated. It is also

---

[92] The Court notes that while both Title VII and Section 1981 claims are evaluated under the same test, the statutes are not equally available to McBride. Title VII prohibits *employers* from discriminating against employees, but the statute does not apply to individuals. *See, e.g.*, Buon v. Spindler, 65 F.4th 64, 78 (2d Cir. 2023) ("[I]ndividuals are not subject to liability under Title VII." (citation omitted)). Therefore, any claims McBride raises under this statute apply only to C&C and do not reach the individual defendants. Moreover, to raise a claim under Title VII, a plaintiff must first file a complaint with the EEOC within 300 days of the alleged discriminatory act. *See* McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 75 (2d Cir. 2010) (citing 42 U.S.C. § 2000e-5(1)(1)). McBride filed a charge of discrimination with the New York State Division of Human Rights on December 2, 2019. Therefore, any incident 300 days before then, including the verbal altercation where Torres is alleged to have called McBride the [N-word] and subsequent issuance of disciplinary warnings to both men, is time-barred and thus not cognizable under Title VII. That said, because Section 1981 both applies to individual defendants and has no parallel administrative exhaustion requirement, this Court reaches the merits of McBride's various discrimination claims.

[93] Terry v. Ashcroft, 336 F.3d 128, 144 (2d Cir. 2003) (citing Morris v. Lindau, 196 F.3d 102, 113 (2d Cir. 1999).

[94] *Muldrow*, 144 S. Ct. at 974.

undisputed that the company then transferred McBride from Eagle Street to Blue Slip because his working relationship with George, his supervisor at Eagle Street, had similarly deteriorated. There is no evidence in the record that could give rise to an inference that McBride was transferred because of his race, national origin, or religion.  Nor does this Court have reason to infer that he was treated less well than George or Torres because of his race, national origin, or religion.  McBride does not even name his colleagues' races, national origins, or religions, making it impossible for this Court to determine whether other C&C employees were treated more favorably than he on those grounds.  Therefore, based on the undisputed record, McBride cannot make a claim of discrimination based on his two transfers.

**Discipline**.  McBride appears to contend that his being issued three disciplinary warnings—one after his altercation with Torres, one for not working his scheduled shift, and one after his altercation with Bailey—were discriminatory discrimination.  Again, this claim fails. First, it is well-settled in this Circuit that a written disciplinary warning, by itself, does not constitute an adverse employment action because "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner."[95]  Because C&C was simply enforcing its existing policies (for example, its 8:00 to 5:00 workday), and because there were no consequences, however small, resulting from his being issued the disciplinary warnings, McBride cannot use them as a basis for his employment discrimination claim.

---

[95] Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006); *see also* Smith v. N.Y. and Presbyterian Hospital, 440 F. Supp. 3d 303, 332 (S.D.N.Y. 2020) ("But 'oral and written warnings do not amount to materially adverse conduct.'" (citation and quotation omitted)); Thomas v. iStar Fin., Inc., 438 F. Supp. 2d 348, 366 (S.D.N.Y. 2006), *aff'd*, 629 F.3d 276 (2d Cir. 2010) (formal verbal warning not adverse action).

Second, there is nothing in the record suggesting that the warnings were issued because of his race, national origin, or religion.[96]  Indeed, in each situation where he was issued a warning after a conflict with a colleague, that colleague was also issued a warning, cutting against an argument that McBride was treated less favorably because of his race, national origin, or religion than similarly situated C&C employees.[97]  Accordingly, McBride cannot make out a discrimination claim based on his disciplinary warnings.

**Termination**.  McBride appears to argue that his termination was discriminatory. Termination is a quintessential "adverse employment action."[98]  Therefore, McBride could plausibly support his claim of employment discrimination if he put forth facts suggesting that C&C terminated his employment because of his race, national origin, or religion.  But he does not.  And C&C's reason for terminating McBride is not in dispute: the parties agree that McBride was terminated after an altercation with a resident, during which, according to a C&C investigation based on surveillance footage, McBride attempted to engage in a fistfight.  Nothing

---

[96] *See* Davis v. N.Y.C. Bd. of Educ., No. 96 Civ. 6064, 2002 WL 1268004, at *1 (S.D.N.Y. June 6, 2002) ("[Employer's] numerous written complaints about plaintiff's performance were legitimate and warranted warnings about violations of established procedure, not the pretext for race discrimination."); Smith v. City of New York, 385 F. Supp. 3d 323, 342 (S.D.N.Y. 2019) (no inference of discrimination where plaintiff issued disciplinary warnings based on his conduct, not race).

[97] *Cf. Risco*, 868 F. Supp. 2d at 100 (S.D.N.Y. 2012) ("In addition to identifying similarly situated employees who are subject to the same performance evaluation and discipline standards, a plaintiff must also show that those employees engaged in acts of comparable seriousness but were not punished as severely as plaintiff."); *Ruiz*, 609 F.3d at 495 (no finding of discrimination where plaintiff does not identify similarly-situated colleague who faced equally-serious allegations but was not punished); Polanco v. 34st Street Partnership, Inc., 724 F. Supp. 2d 420, 426 (S.D.N.Y. 2010) (disciplinary warnings not evidence of employer's discriminatory intent where employer issued similar warnings to other employees of color).

[98] *See, e.g., Terry*, 336 F.3d at 138 (2d Cir. 2003) ("Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." (citations omitted)).

in the record suggests that C&C's decision was motivated by discriminatory intent.  Rather, the

undisputed record indicates that C&C has a plausible, non-discriminatory reason for terminating

McBride.[99]

**Retaliation**.  McBride alleges that, after he filed a complaint with C&C's human

resources department, C&C took docked ten hours from his paycheck and changed his hours.  He

does not expressly claim, but could possibly also claim, that he was terminated in response to his

filing an employment discrimination claim with the State of New York.  "To make out a prima

facie case of retaliation at the summary judgment stage, Plaintiff 'is required to present' evidence

that '(1) []he engaged in protected activity, (2) the defendant was aware of that activity, (3) the

plaintiff suffered an adverse employment action, and (4) there was a causal connection between

the protected activity and the adverse employment action.'"[100]

There is no doubt that McBride's act—filing a discrimination complaint—is a protected

activity.[101]  If McBride's complaint was explicitly about discrimination as he claims, C&C was

undoubtedly aware that McBride was engaging in protected activity.[102]  Docked pay, a change in

---

[99] *Cf.* Adams v. Equinox Holdings, Inc., 662 F. Supp. 3d 444, 457 (S.D.N.Y. 2023) (finding that employer's non-discriminatory reason for terminating plaintiff—plaintiff's altercations with colleagues—defeated ADEA discrimination claim not supported by evidence of discriminatory intent).

[100] Renondeau v. Wildlife Conservation Soc'y, No. 19 Civ. 2415, 2024 WL 1156643, at *9 (S.D.N.Y 2024).

[101] *See* La Grande v. DeCrescente Distrib. Co., Inc., 370 F. App'x 206, 212 (2d Cir. 2010) ("The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including complaints to management.").

[102] *See* Moore v. Hadestown Broadway Ltd. Liab. Corp., No. 23 Civ. 4837, 2024 WL 989843, at *6 (S.D.N.Y. Mar. 7, 2024) ("[A] plaintiff satisfies the second prong of the retaliation pleading standard if her complaint plausibly alleges that such protected activity put the defendant on notice that [Plaintiff's] complaints were about . . . discrimination, not just general unsatisfactory or unfair conduct." (quotation and citation omitted)).

shift, and termination constitute adverse employment actions in that they impose a harm on the terms and conditions of McBride's employment.[103]

Therefore, the only remaining questions are whether there is a causal link between McBride filing a human resources complaint and C&C docking his pay and changing his shift, and whether there is a causal link between McBride filing a New York State discrimination complaint and his termination. Based on the record before it, this Court finds that McBride has failed to show causality sufficient to support a retaliation claim with respect to either event. McBride provides no evidentiary support for his claim that his hours changed *because* he filed a complaint; and C&C offers valid, non-discriminatory reasons for "changing" McBride's hours— that is, it directed him to work an official full shift from 8 am to 5 pm, rather than permitting him to work through lunch and leaving at 4 pm, as he preferred.[104]

Finally, while temporal proximity between a complaint and an adverse employment action can give rise to an inference of discrimination, such an inference is overcome where the employer offers a legitimate, nondiscriminatory reason for the action.[105] Here, McBride was terminated over two months after he alleges he filed his New York State discrimination complaint, but, as explained above, C&C offers a legitimate nondiscriminatory reason for

---

[103] *See* Muldrow v. City of St. Louis, 144 S.Ct. 967, 974 (2024).

[104] *See* Melie v. EVCI/TCI Coll. Admin., 374 F. App'x. 150, 152-53 (2d Cir. 2010) (finding no discriminatory retaliation where defendant employer "proffered legitimate, non-retaliatory reasons for" changing plaintiff's working hours).

[105] *Cf.* Freud v. N.Y.C. Dep't of Educ., No. 21 Civ. 2281, 2022 WL 889213, at *13 (S.D.N.Y. Mar. 25, 2022) ("The temporal proximity of events may give rise to an inference of retaliation . . . and [t]hough there is no bright-line rule on temporal proximity courts in this Circuit have held that a one to two month period between the protected activity and adverse employment action is generally sufficient to make a prima facie causation showing." (internal quotation marks omitted)). *But see* Ragin v. E. Rampo Cent. Sch. Dist., No. 5 Civ. 6496, 2010 WL 1326779, at *24 (S.D.N.Y. Mar. 31, 2010) ("[M]any courts in this circuit have held that periods of two months or more defeat an inference of causation.").

terminating McBride: his increasingly acrimonious relationship and conflicts with tenants and residents. The record does not include any evidence suggesting that this reason was pretextual.

In sum, even drawing all reasonable inferences in his favor, McBride's employment discrimination and retaliation claims fail, and Defendants' summary judgment motion is granted as to these claims.

### 2. Hostile Work Environment

#### a. *Legal Standard*

Hostile work environment claims are evaluated under a different framework than other types of employment discrimination claims: "hostile work environment claims consider the workplace environment as a whole."[106] "To establish a hostile work environment under Title VII [or] § 1981, . . . a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"[107] "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive."[108] The analysis is based on the totality of the circumstances; a court evaluating a hostile work environment must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

---

[106] Desouza v. Off. of Child. and Fam. Servs., 18 Civ 2463, 2019 WL 2477796, at *4 (E.D.N.Y. June 12, 2019).

[107] Littlejohn v. City of New York, 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

[108] *Id.* at 321 (quoting Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014)).

employee's work performance."[109]  Generally, there must be a pattern of hostility rather than one-off incidences.[110] Finally, "[t]o establish a hostile work environment, a plaintiff must [ ] demonstrate that the discriminatory conduct occurred because of [his] membership in a protected class."[111]

There is one additional hurdle to bringing a successful hostile work environment claim. "In addition to establishing that []he was subjected to a hostile employment environment, plaintiff must establish that the conduct which created the hostile situation should be imputed to the employer."[112]  "Where the harassment was done by a co-employee without supervisory authority over the plaintiff, liability will be imputed to the employer only if it is negligent, that is, if it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."[113]  But when harassment is done by a supervisor, it is imputed to the employer.

b.  *Application*

McBride alleges he was subject to various forms of harassment based on his race, national origin, and religion.  McBride alleges that we was called, among other things, a "fake Trinidadian," "[N-word]," "fake Muslim," "Pussy,"[114] "sissy,"[115] and "puta."  McBride's various

---

[109] *Harris*, 510 U.S. at 21.

[110] *See* Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) ("As a general rule, [the offending] incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." (quotations omitted))

[111] White v. Manhattan & Bronx Surface Transit Operating Auth., 18 Civ. 3627, 2022 U.S. Dist. LEXIS 165428, at *23 (S.D.N.Y. Sept. 13, 2022).

[112] Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 63 (2d Cir. 1992).

[113] Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir. 2001) (quotations omitted).

[114] In his pleadings, McBride sometimes alleges he was called a "Pussyhole" or "Pussy hole" as well.

[115] In his pleadings, McBride sometimes spells this as "cissy" and alleges that he was called a "cissy hole" or "c hole" as well.

allegations fall into essentially three categories: (1) online harassment; (2) comments and harassment by tenants and strangers; and (3) comments and harassment by colleagues. The Court considers each of these in turn and concludes that summary judgment is appropriate for Defendants with respect to any and all claims sounding in hostile work environment.

**Online Harassment and Comments/Harassment by Tenants.** McBride's only evidence of the social media posts is his own testimony that he saw a video of himself on a stranger's phone in the subway. He alleges that George, his supervisor at Eagle Street, was responsible for the posts, and that, as a consequence, he "began to hear tenants uttering" epithets at him, and that he even heard "the same thing[s]" while "[h]eading home on the subway," "[e]specially from Spanish People."[116] But McBride does not dispute that he neither saw George post any content on social media nor saw anything about himself on social media pages linked to George; and when he complained to C&C about the purported posts, the company was unable to investigate because he did not provide links or any other means of accessing the online content.[117] There is nothing in the record to support the notion that his supervisor or co-workers were responsible for the purported social media videos. Moreover, while McBride conclusorily alleges that George encouraged tenants to harass him, McBride does not say that he ever actually witnessed George instructing tenants to do so or to otherwise treat him negatively. There is therefore no "hard evidence" in the record that would allow the Court to impute the alleged statements and actions of the Greenpoint Complex tenants or of any other non-parties onto George or any of the other Defendants.[118]

---

[116] SAC 9.

[117] C&C Defs.' Rule 56.1 Statement ¶¶ 20, 71.

[118] D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998) (A party opposing summary judgment must point to "hard evidence showing that [his] version of the events is not wholly fanciful.").

**Comments/Harassment by Colleagues.** McBride points to various incidents involving colleagues, but none can support a hostile work environment under the facts of this case. First, McBride was called the n-word by Torres. To be sure, "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as '[N-word]' by a supervisor in the presence of his subordinates."[119] It is undisputed, however, that C&C took corrective action once it became aware of that incident by issuing Torres a reprimand. Where, as here, an employer takes corrective action calculated to end the conduct in question, an incident cannot support a hostile work environment claim.[120]

McBride also points to a handful of other incidents in which he was called various names, including a "puta" by Torres; a "cissy hole" and "pussy hole" by George; and a "pussy" by the unnamed C&C employee who McBride alleges is a property manager. These names are certainly pejorative and vile, but on this record, they do not support McBride's claims for hostile work environment, which are based on race, religion, and/or national origin. McBride provides no evidence, nor offers any explanation, indicating that these insults are connected to or occurred *because* of his membership in a protected class.

McBride also points to his two altercations with Bailey, including the incident in which McBride pulled out a knife. But there is nothing in the record suggests that their conflicts were based on a protected characteristic. Accordingly, the two incidents between those men cannot support McBride's hostile work environment claim.

---

[119] Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 24 (2d Cir. 2014) (internal quotation marks and citation omitted).

[120] *See* Gonzalez v. Beth Israel Med. Ctr., 262 F. Supp. 2d 342, 355 (S.D.N.Y. 2003) ("An employer's remedy need not necessarily expel the harasser from the environment to be effective, but rather it should be 'sufficiently calculated to end the harassment.'" (citation omitted)).

Finally, McBride cites to a comment by a colleague that could sound in national origin discrimination, in which George called him a "fake Trinidadian" to his face. But McBride could not recall if this happened more than once.[121] The hallmark of a hostile work environment claim under Title VII is that the conduct in question be severe and pervasive.[122] The statute "is not a general civility code,"[123] and the "'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' [does] not affect the conditions of employment to sufficiently significant degree to violate Title VII."[124] Accordingly, on the facts of this case, this comment alone is not enough to constitute a hostile work environment.

### B.  State and City Claims

Because Plaintiff's federal claims are dismissed, the Court declines to exercise supplemental jurisdiction over his remaining claims.[125] Accordingly, all claims raised by Plaintiff under state and city law are dismissed, without prejudice to refiling in state court.

---

[121] C&C Defendants' Rule 56.1 Statement ¶ 27 ("McBride claims that George called him 'fake Trinidadian' to his face but could not recall how many times.").

[122] *Cf.* Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity . . . meaning that '[i]nstead or sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.'" (citation omitted)).

[123] Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999).

[124] Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).

[125] *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."); Cohen v. Postal Holdings, LLC, 873 F.3d 394, 404 (2d Cir. 2017) (Calabresi, J., concurring) ("[A]fter all federal claims have been dismissed, the default rule is that federal courts should not decide related state-law claims unless there is good reason for doing so.").

### C. Leave to Amend

"Generally, leave to amend should be "freely given," . . . and a *pro se* litigant in particular 'should be afforded every reasonable opportunity to demonstrate that he has a valid claim.'"[126]   Here, however, Plaintiff has twice already amended his Complaint.  *See* ECF Nos. 34, 40.  "[R]epeated failure to cure deficiencies" weighs against granting further leave to amend.[127]   Moreover, Plaintiff has not requested leave to amend, and therefore has not identified how further amendment would cure any deficiencies with his pleadings.[128]   At any rate, amendment would be futile here, where the problems with Plaintiff's claims are substantive and not merely the result of "inartfully pleaded" allegations.[129]

---

[126] Matima v. Celli, 228 F.3d 68, 81 (2d Cir. 2000) (citations omitted).

[127] *See* Vasquez v. Reece Sch., No. 22 Civ. 5986, 2024 WL 497433, at *2 (S.D.N.Y. Feb. 8, 2024).

[128] *See id.*

[129] In re Sanofi Sec. Litig., 87 F. Supp. 3d 510, 548-49 (S.D.N.Y. 2015).

**CONCLUSION**

For the foregoing reasons, Defendants' motions for summary judgment are GRANTED. For the same reasons that the Court grants judgment for the represented Defendants, the Court also *sua sponte* dismisses the claims against the individual defendants not represented by counsel, Luis Torres and Wilson Esquilin.[130]

The Clerk of Court is respectfully requested to terminate ECF Nos. 135 and 142 and to mail a copy of this Order to Plaintiff.

SO ORDERED.

Dated: October 1, 2024
New York, New York

_____
DALE E. HO
United States District Judge

The Clerk of Court is respectfully directed to strike ECF No. 162.

---

[130] *See* Grant v. County of Erie, 542 F. App'x 21, 24 (2d Cir. 2013) ("A district court may dismiss an action *sua sponte* for failure to state a claim so long as the plaintiff is given notice of the grounds for dismissal and an opportunity to be heard.").